## Case No. 15,870.

### UNITED STATES v. NEWMARK.

[3 Sawy. 584;[1] 22 Int. Rev. Rec. 114.]

District Court, D. California.  March 28, 1876.

#### CUSTOMS DUTIES—FORFEITURES—UNDER-VALUATION—CONSIGNEE.

Where, in a suit brought by the United States to recover the value of certain goods alleged to have been fraudulently invoiced below their true cost, it appeared that the defendant was not the owner or shipper of the goods, but merely a consignee thereof for the purpose of selling them: *Held*, that knowledge on his part of the fraudulent undervaluation was necessary to establish the "actual intention to defraud the United States" within the meaning of the sixteenth section of the act of June 22, 1874 [18 Stat. 189].

[This was an action at law by the United States against J. P. Newmark.]

Walter Van Dyke and John M. Coghlan, for the United States.

Latimer & Morrow, C. A. McNulty, E. B. Mastick, and Eastman & Neuman, for defendant.

HOFFMAN, District Judge. This is an action brought by the United States to recover the value of certain hides alleged to have been fraudulently imported into this port by the defendant. The alleged fraud consisted in entering the goods by means of false and fraudulent invoices, which stated the cost of the goods at the place of exportation to be a less sum than the actual cost thereof, with intent to evade a part of the duties thereupon and legally chargeable thereon.

By the sixteenth section of the act of June 22, 1874 (18 Stat. 189), it is in substance provided that in all actions to enforce a forfeiture or to recover the value of goods by reason of any violation of the provisions of the customs revenue laws, it shall be the duty of the court to submit to the jury as a distinct and separate proposition, whether the alleged acts were done with an actual intention to defraud the United States, and to require upon such proposition a special finding by the jury, and if the cause be tried by the court without a jury, it shall be the duty of the court to pass upon and decide such proposition as a distinct and separate finding of fact, and unless intent to defraud shall be so found, no fine, penalty or forfeiture shall be imposed.

Two separate issues are thus presented in this case: (1) Were the goods undervalued in point of fact and the invoices thereof false; and (2) were the entries of the goods made with an actual intention on the part of the defendant to defraud the United States.

The evidence as to the actual cost or market value of the goods at the places of exportation is very voluminous and conflict-

ing. I have not thought it necessary to enter into an elaborate analysis of it, as the plaintiffs have, in my judgment, failed to prove the actual fraudulent intent on the part of the defendant which the statute requires the court to find as a distinct and separate proposition before a forfeiture can be imposed. In discussing the evidence bearing upon this proposition, I shall therefore assume that the goods were in fact invoiced at less than their cost. The question is, did the defendant know it? The number of false entries upon which the action is brought is twenty-seven. They were made during a period extending from July 29, 1869, to February, 1872. If the defendant was the owner of the goods, or, if the importations were made on his account, the inference would be irresistible that he was aware of the false valuation. He could not have failed to know what prices he paid for them. But he contends that in every instance he was a bare consignee, that he had no knowledge of the price paid by his consignor, and that he merely sold the goods and placed the net proceeds to the credit of the latter.

To these facts the defendant testifies in the most positive manner. To meet this proof the government has produced the entries made at the custom house with the oaths and invoices that accompany them. From these entries it appears that in twelve instances out of twenty-seven the defendant on entering the goods took the "owner's oath" instead of that of a consignee. It is replied that this was done through the mistake of the broker who prepared the papers, and in support of this averment the defendant appeals to his books. The entries from the custom house show that on the first five importations the defendant took the consignee's and not the owner's oath. The entry of the sixth importation is missing. But in all of these instances the journal of the defendant shows that the proceeds of the goods were credited to the consignor. The book containing the copy of the account of sales of these shipments rendered to the shippers is not produced. It is alleged to have been destroyed. The evidence on that point will be considered hereafter.

On the seventh importation the defendant took the owner's oath. He claims that this was by the mistake of his broker, and in support of his assertion refers to the fact that the consular certificate presented with the invoice to the custom house shows that the consignor was the shipper and owner. He also exhibits the entries in his journal where the proceeds are duly credited to the consignor, and his press-copy account of sales, in which an account is rendered to the consignor of the proceeds of and charges upon the goods.

The circumstances are similar in regard to the eighth importation. The defendant took the owner's oath. But the consignor

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

declares before the consul that he is owner and shipper, and the journal and account-sales-book show that an account of sales and charges was duly rendered to the shipper, and a corresponding credit given in the journal. It is unnecessary to state in detail the circumstances as disclosed by the custom house papers and the defendant's books with regard to each importation in which he has taken the oath as owner. They may be summarized as follows:

In six instances out of the twelve the papers show that the shipper declared before the consul that he was the owner of the goods shipped. In the other cases he declared himself to be the shipper. In every instance but two, both the journal and the account-sales-book show that accounts of sales of the goods were duly rendered to the shippers, and credits duly given in the journal. In the two instances referred to, the entries in the journal cannot be found. But the accounts of sales are produced. In every other instance the oath taken by the defendant is that of a consignee. The journals show a credit given to the shipper, and the account-sales-book an account rendered to him, except as before stated in the case of the first six importations, the account-sales-book relating to which has been destroyed.

.The broker employed by the defendant corroborates in the most positive manner the testimony of the defendant. He states that his instructions invariably were to enter the goods in the name of defendant as consignee, and that if the form of oath as owner has been filled out and submitted for his signature it was through mistake. He attributes the error to the great haste with which business of this nature is necessarily conducted. He might with probably equal truth have added that such errors arise from the laxity and carelessness which universally prevail when any "custom-house" oath is to be taken or administered. The broker's statement as to his mistakes or those of his clerk is confirmed by the fact that in several instances where the owner's oath was taken by the defendant the papers themselves disclosed that the shipper was the owner. No proof has been offered on the part of the United States to rebut the evidence on this point produced by the defendant. The correspondence between himself and the shippers of the goods for a considerable period has not been produced. The district attorney suggests that it may have been purposely destroyed. But the defendant has shown by his own testimony, by that of his partner, and by the porter in his employment, that the papers in question were packed in a box and placed in a cellar where they became saturated with water and rat-eaten. His partner ordered them burnt up as useless, which was done by the porter. This occurred, they assert, before this suit was commenced or antici-

pated. This evidence is uncontradicted except by some testimony tending to show that it was possible that the defendant might have been aware that some investigations with regard to these importations were on foot.

We are, I think, justified in concluding that the government has failed to establish a guilty knowledge of the falsehood of the invoices. and the consequent intent to defraud, from any relation of the defendant to the goods as owner. But if he had that knowledge as agent, merely, it would be sufficient to establish the fraudulent intent. But of this there can scarcely be said to be any proof. The defendant had, as he testifies, no interest whatever in the shipments, not even by way of commissions. His remuneration was derived from commissions on purchases made by him at this place, of goods to be shipped to his correspondents. No commissions were charged by him on goods consigned to him for sale.

The price at which the goods in question were valued in the invoices had been for a long time uniform and universal among all the importers. They appear to have valued them at one dollar and fifty cents each, irrespective of their quality or condition. This valuation had been for years accepted as just by the custom-house authorities. I see no reason for supposing that the defendant, receiving the goods as he did, would be more likely to know their real cost or true value than the officers of the government charged with the duty of ascertaining those facts. If, however, the facts were clear and the undervaluation gross and undeniable, we might still suspect that the defendant must, in the course of his business, have become aware of it. But even after the very full investigation which the subject has undergone in the trial of this cause, the evidence remains very conflicting, and the conclusion to be reached open to doubt. It is, I think, plain, that parties at this place who sought to engage in the trade were unable to obtain at Mazatlan, La Paz, and Cape St. Lucas, hides at the price at which these goods were invoiced. The explanation of this fact, given by the defendant's witnesses, is that the trade in hides is at these places in the hands of a small number of persons who enter into contracts with the rancheros to take all their hides, of whatever quality, at a fixed price, and to make advances to them on the credit of the hides to be subsequently delivered. They thus have, it is said, a kind of monopoly which not only enables them to secure hides at a lower rate than that which a foreigner would be obliged to pay, but also to advance the prices at the ports of shipment. It is also testified that when "culls." or damaged hides, bull hides, etc., are taken into account, an average price of one dollar and fifty cents is not an unfair statement of the cost. although selected lots

might be worth much more. A large number of witnesses testify to these facts, among them three ex-consuls of the United States, who are acquainted with or have been engaged in the trade.

What conclusion should be reached after a careful consideration of all the testimony, I have not determined, and it is unnecessary now to decide. I advert to the state of the proofs merely to show that the undervaluation, if any, was not so gross and indisputable as to justify the belief that it was notorious to all engaged in the trade, and consequently was known to the defendant. On the issue, therefore, upon which, by the terms of the act, I am required to pass as a distinct and separate proposition, I find that it is not proved that the acts alleged in the complaint were done with an actual intention to defraud the United States.

Judgment must, therefore, be entered for the defendant.